78 F.3d 594
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Trevor Leslie SNELL, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 94-70802.
 United States Court of Appeals, Ninth Circuit.
 Submitted Feb. 9, 1996.*
Decided March 8, 1996.
 
 1
 Petition to Review a Decision of the Immigration and Naturalization Service, INS Asm-syq-nbf.
 
 INS
 
 2
 REVIEW DENIED.
 
 
 3
 Before: HALL and TROTT, Circuit Judges, and RAFEEDIE, District Judge.**
 
 
 4
 MEMORANDUM***
 
 Introduction
 
 5
 Trevor Snell petitions for review of a decision of the Board of Immigration Appeals denying him discretionary relief from deportation, following his conviction for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841, 846. He argues that: (1) the immigration judge incorrectly concluded that Snell lacked credibility with regard to his claim of having been rehabilitated; and (2) the immigration judge failed to consider all relevant equities. We deny the petition.
 
 Discussion
 A. Lack of Credibility
 
 6
 The following facts were significant to the immigration judge's finding of a lack of credibility: (1) Snell would not admit the depth of his drug problem; (2) he attempted to minimize his role in the criminal offense; and (3) he provided sparse details concerning his claim of having paid back taxes.
 
 1. Depth of Drug Problem
 
 7
 The transcript of the section 212(c) relief hearing supports the immigration judge's finding that Snell had difficulty acknowledging that he was a drug addict. The following exchange took place during cross-examination by the government attorney:
 
 
 8
 Q: Are you and have you been a narcotics addict and a drug abuser?
 
 
 9
 A: I'm not qualified to say whether I was an addict, sir, I did use drugs, yes.
 
 
 10
 * * *
 
 
 11
 Q: Well, have you ever felt you've been a drug abuser or drug addict in the past?
 
 
 12
 A: I don't know if I've ever had to .. I think it was my own decision that I used drugs.
 
 
 13
 Q: Well, were you a drug addict or drug abuser?
 
 
 14
 A: I don't think so, sir.
 
 
 15
 (Administrative Record, hereinafter "A.R.," at 67-68).
 
 
 16
 Despite having testified that he was not qualified to say whether he was an addict, Snell answered "No, sir" when asked by the immigration judge, "Are you telling me that in your own opinion you were not addicted to cocaine?" (A.R. at 76).
 
 
 17
 Snell's denial of being an addict contradicts his own written statement to the Probation Officer who wrote the Presentence Report. Snell wrote:
 
 
 18
 In 1981, I starting indulging in cocaine, at first I was a weekend user but soon the drug was controlling my life to the point I was freebasing it everyday [sic]. It was then I started selling coke to supply my habit. I had lost my job at Reynolds Metals Company in Kent, Wa. My wife eventually left me and had relocated to Spokane, Wa. In about the Fall of 1983, I was using about $1000.00 a day smoking coke.
 
 
 19
 (A.R. at 263) (PSR Report).
 
 
 20
 Snell's own expert witness, Herman Ryans, the Geiger Substance Abuse Program supervisor, testified that Snell told him how he (Snell) had become addicted to cocaine and had used an exceptional amount of drugs. (A.R. at 207). Ryans testified that, in his professional opinion, Snell "has been" a cocaine addict. (A.R. at 208).
 
 
 21
 We therefore conclude that the immigration judge had a substantial basis for concluding that Snell would not admit the depth of his drug problems.
 
 2. Role in the Criminal Offense
 
 22
 The record also supports the immigration judge's finding that Snell had difficulty accepting his role in the criminal offense. Snell testified that each person in the drug distribution conspiracy wanted to cooperate with the government. According to Snell, "all they were doing [was] pointing fingers, saying, you know, Snell sold this much and this much, you know. I was a little guy, you know." (A.R. at 110).
 
 
 23
 Snell downplayed his role in the conspiracy at other points. He could not provide details about the quantities of cocaine that he sold, other than that he was selling about a kilogram a month. (A.R. at 141-42). He didn't remember the largest quantity of cocaine he ever held. (A.R. at 142).
 
 
 24
 Snell also failed to provide direct answers concerning profits from drug sales. For example, he claimed that he had been misquoted in the Presentence Report as saying that he earned a profit of $5,000 per kilogram. (A.R. at 144). However, Snell never clarified the record by stating his exact profit margin.
 
 
 25
 We therefore conclude that the record also provides substantial evidence to support the immigration judge's finding that Snell tried to minimize his role in the conspiracy.
 
 3. Back Taxes
 
 26
 Finally, the record supports a finding that Snell's attempt to show rehabilitation through his payment of back taxes owed on his drug profits was incredible.
 
 
 27
 Snell paid the back taxes only on the advice of a tax attorney. (A.R. at 145). He later added that he did so also on the advice of his pastor. (A.R. at 163).
 
 
 28
 In addition, because Snell was not forthcoming with details concerning his profits and did not provide copies of the amended tax returns, it is impossible to tell whether he actually declared all the income that he earned from his drug sales.[1]
 
 
 29
 We conclude that there is substantial evidence in the record to support the immigration judge's finding that Snell's payment of back taxes was motivated largely by a concern to avoid tax liability to the IRS, and that Snell still underreported his actual drug income during 1984-86.
 
 
 30
 In sum, we conclude that there is sufficient evidence in the record from which a reasonable mind might accept the finding by the immigration judge that Snell's claim of rehabilitation was not credible.
 
 B. The BIA's Weighing of the Equities
 
 31
 Snell next argues that even if the immigration judge's factual findings concerning rehabilitation are upheld, the BIA failed to consider all relevant factors.
 
 
 32
 Snell's argument that the BIA did not consider his positive equities is without merit, since the immigration judge specifically considered Snell's "long time residence in the United States, his coming here at the age of 11, his breaking of all ties to Pakistan, the severe hardship that deportation would inflict upon his family, and his honorable military service." (A.R. at 77-78).
 
 
 33
 Snell also argues that the immigration judge did not consider his employment record in weighing the equities. The record in this case indicates that Snell's income from drug sales between 1984 and 1986 was at least $72,000. (A.R. at 165). During that same three year period, his adjusted gross income from legitimate employment was $75,769.[2] (A.R. at 72). Thus, almost half of his total actual income during that three year period came from his drug sales.
 
 
 34
 Thus, it appears that although Snell generally had steady employment, he did not excel at any particular job. We conclude that this fact, and the fact that half his family income during that three year period came from drug sales, gave the immigration judge substantial evidence to find that Snell's employment record was not a positive factor in his favor.
 
 
 35
 Next, Snell argues that the immigration judge improperly considered rehabilitation or lack thereof. Snell's argument rests on the assumption that the immigration judge treated the lack of rehabilitation as a negative factor against Snell.
 
 
 36
 In Yepes-Prado v. INS, 10 F.3d 1363, 1373 (9th Cir.1993), we noted that the immigration judge "must recognize that the limited amount of time between release from incarceration and the initiation of deportation proceedings may make it virtually impossible for petitioners to demonstrate that they have been rehabilitated."
 
 
 37
 In this case, however, it appears that Snell argued to the immigration judge that his rehabilitation was a positive factor in his favor. (A.R. at 229-30) ("[I]t is clear, Your Honor, that my client has changed, that he's rehabilitated himself").
 
 
 38
 The immigration judge did not appear to treat lack of rehabilitation as an adverse factor. The adverse factors mentioned were drug abuse, drug dealing, tax evasion, and long periods of criminality. (A.R. at 78-79). Thus, the immigration judge did not credit Snell with the positive factor of rehabilitation, but did not use Snell's lack of rehabilitation as a negative factor either. Rehabilitation or lack thereof simply did not enter the balancing of equities.
 
 
 39
 Finally, Snell argues that the immigration judge and the BIA adopted "a per se rule that a conviction for a drug offense involving a certain amount of drugs precludes Section 212(c) relief." (Petitioner's Brief, at 29). The immigration judge stated in his decision: "[h]ad the respondent been involved in drug trafficking to a much lesser extent, the result in this case may well have been different and the Service would be appealing." (A.R. at 79). Snell seizes upon this language to argue that, essentially, there was no way that he could have made a sufficient showing of positive factors to earn § 212(c) relief based on his crime of conviction.
 
 
 40
 We believe that, taken in proper context, the immigration judge's statement meant that since Snell was convicted of a serious drug felony, he had to make an outstanding showing of equities. A showing of rehabilitation plus his other positive factors would have been an outstanding showing. Since Snell failed to show that he had been rehabilitated, he made a significant, but not outstanding showing of equities. Had Snell not been convicted of such a serious drug felony, he would not have had to make an outstanding showing of equities, and a showing of rehabilitation would not have been necessary.
 
 
 41
 The immigration judge set a high standard, but one well within his range of discretion and one that was not insurmountable, even for a convicted drug trafficker. Had Snell made a better showing of equities, such as through a credible demonstration of rehabilitation, stronger business or property ties to the country, or a more consistent history of employment, the immigration judge might have granted § 212(c) relief.
 
 Conclusion
 
 42
 We find substantial evidence in the record to support the immigration judge's finding of lack of credibility with regard to rehabilitation. We also find that the immigration judge considered all relevant equities in reaching his decision not to grant § 212(c) relief. Accordingly, we deny the petition.
 
 
 43
 PETITION DENIED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 The Honorable Edward Rafeedie, United States District Court Judge for the Central District of California, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided for by Ninth Circuit Rule 36-3
 
 
 [1]
 For example, Snell sold a total of about thirty (30) kilograms of cocaine. (A.R. at 111). At a profit of about $3300 per kilogram--a figure derived from Snell's own admission that he made a $5000 profit on a sale of one and a half kilograms of cocaine (A.R. at 145)--he would have earned about $99,000 in profit. Yet, he declared only $72,000 in income. (A.R. at 165)
 Snell's true drug profits may have been even larger. At the hearing, he testified that his real estate business, Vanguard Realty, was little more than a front for his drug profits. (A.R. at 155-56). Yet, Snell funnelled at least $95,000 into the company. To that $95,000 must be added $20,000 that he paid to his old supplier for a drug debt from 1981. (A.R. at 263).
 
 
 [2]
 $11,687 in 1984, $14,091 in 1985, and $49,991 in 1986